**Opinion issued August 26, 2025**



In The

# Court of Appeals

### For The

# First District of Texas

————————————

### NO. 01-25-00283-CV

————————————

## IN RE AJM CONSTRUCTION COMPANY, INC. AND RESICOM, INC., Relators

---

### Original Proceeding on Petition for Writ of Mandamus

---

### MEMORANDUM OPINION

Relators AJM Construction Company, Inc. and Resicom, Inc. seek a writ of

mandamus challenging the portion of the trial court's March 6, 2025 order granting

their motion to compel the neuropsychological examination of Real Party in Interest

Carlos Trevino, but directing that the examination be audio and video recorded.[1]

---

[1]     The underlying case is *Carlos Trevino v. AJM Construction Company Inc. and Resicom, Inc.*, cause number 2022-07009, pending in the 125th District Court of Harris County, Texas, the Honorable Kyle Carter presiding.

Together with their petition for writ of mandamus, Relators filed a motion for temporary relief, which this Court granted, staying all trial court proceedings until resolution of the mandamus petition.

We conditionally grant mandamus relief.

## Background

This case arises from a personal injury suit filed by Real Party in Interest Carlos Trevino against Relators AJM Construction Company, Inc. and Resicom, Inc. for injuries allegedly resulting from a motor vehicle collision in July 2020, involving Trevino's car and another vehicle. Trevino alleges that Relators removed a stop sign while performing construction work, resulting in the accident. He sued Relators for negligence and gross negligence, seeking to recover damages for physical pain, mental anguish, physical disfigurement, physical impairment, and medical care expenses, and exemplary damages.

Trevino initially was diagnosed with spasm to the back; sprain to the neck, shoulder, ankle, and knee; and post-traumatic headaches. He later was examined by neurologist Dr. Andres Keichian who, following a series of tests, diagnosed Trevino with traumatic brain injury. Trevino also underwent a neuropsychological evaluation that was performed by Dr. Gabriel Jasso, a licensed neuropsychologist. The evaluation consisted of a four-hour "Examinee Interview & Neurobehavioral/Mental Status Exam," a ten-hour "Neuropsychological [T]esting

2

[E]valuation [S]ervices," and a ten-hour "Neuropsychological Testing & Scoring." Based on these evaluations, Dr. Jasso concluded that Trevino's "physical and emotional condition [were] interfering with his cognitive abilities." Trevino designated Dr. Jasso and Dr. Keichian as testifying experts and Dr. Jasso provided a report.

Relators retained Dr. Corwin Boake, a board-certified clinical neuropsychologist, to conduct an independent medical examination ("IME") of Trevino. Trevino agreed to the IME, but only on the condition that it be video recorded, which Relators opposed. On November 14, 2024, Relators moved to compel Trevino's IME under Rule of Civil Procedure 204.1. Relying on *In re Society of Our Lady of the Most Holy Trinity*, Relators argued that Trevino's examination should be ordered without it being videotaped because Trevino had not shown good cause in the form of special circumstances or particular need to warrant the video recording.[2] Relators stated the examination could occur at a mutually agreeable location and would last no longer than two or three hours.

In support of their motion to compel, Relators submitted the deposition testimony of Trevino's neurologist, Dr. Keichian, as well as the medical report from Trevino's neuropsychologist, Dr. Jasso. Although Trevino had complained about

---

[2] *In re Soc'y of Our Lady of Most Holy Trinity*, 622 S.W.3d 1 (Tex. App.—Corpus Christi-Edinburgh 2019, orig. proceeding).

suffering from post-traumatic stress disorder and difficulty in "remembering important things that must be done," Dr. Jasso found that Trevino's "overall mental status seemed normal," noting that he was "oriented" and "cooperative" during the evaluation. Dr. Jasso also noted that Trevino "answered questions appropriately[,]" "provided evidence of good conation[,]" and "displayed no evidence of a serious mental illness . . . ." Relators later filed a supplemental motion to compel attaching as an exhibit the affidavit of their expert, Dr. Boake. Explaining why he opposed the videorecording of his neuropsychological examination of Trevino, Dr. Boake stated there "is a conflict between the proposed recording . . . and [his] obligation to comply with guidelines of neuropsychology organizations." He further explained that recording his examination of Trevino "would create a deviation from standard neuropsychological procedures" including a recent guideline stating that "recording of the administration of neuropsychological tests is not permitted" because

> [t]hird party observation, whether in person, recorded or electronic, remains a potential threat to the validity and reliability of evaluation results, and violates test security guidelines, ethical principles and standards of conduct in the field.
>
> . . .
>
> [o]bservation or recording of test administration violates ethical standards that require psychologists to strive to obtain test data that are valid and that represent the examinee's best possible performance.

4

Dr. Boake opined that given these ethical considerations and related prohibition, he would not be able to conduct a standard examination of Trevino if his neuropsychological examination were recorded. Instead, he would have "to restrict [his] examination" to "mostly checklists and questionnaires" and he would have to omit "most routine neuropsychological tests."

Trevino responded that Relators' motion should be denied because it was untimely. Trevino further argued that to the extent Relators' motion was granted, the IME should be video recorded. Relying on this Court's opinion in *In re UV Logistics, LLC*, 682 S.W.3d 612, 623–24 (Tex. App.—Houston [1st Dist.] 2023, orig. proceeding), Trevino argued that "special circumstances that might support recording [of an IME] include where the examinee suffers from a disability that might impair his ability to communicate with counsel [about] what occurs during the examination." Trevino attached to his response excerpts from the depositions of Dr. Keichian and his mother, Carolina Tejeda, as well as medical reports from Dr. Keichian. Trevino noted that Dr. Keichian testified that his "symptoms after the car crash include[d] memory problems, difficulty concentrating, headaches, and decreased executive functions," and that his mother testified he "ha[d] constant memory issues." According to Trevino, this evidence "show[ed] that [Trevino] ha[d] memory and focus issues that are constant and unbearable and that he ha[d]

memory problems, difficulty concentrating, decreased executive functions . . . which likely will affect his ability to communicate with his attorney[] about the testing."[3]

The trial court held a hearing on Relators' motion to compel. Relators argued that Trevino's opposition to their motion to compel did not "rise[] to the level of requiring a videotaping of the [IME]" and that a recording would "inhibit [Dr. Boake's] ability to conduct the exam" because he "wo[uldn't] be able to conduct [a] full battery of tests . . . ." Relators further argued that requiring that the examination be recorded would violate the parties' "equal footing" as Trevino's examination by his own doctor was not audio or video recorded, and "[t]here were apparently no issues that came up during that exam where [Trevino's] attorney felt like his client wasn't going to be able to communicate what happened in that exam." Relators noted that during Trevino's deposition, "[h]e was able to clearly and accurately communicate what happened to him during his wreck, [and] what his symptoms were." Relators informed the court that during the IME, Dr. Boake would not ask Trevino questions about the accident, and would produce "a report that[] . . . clearly detail[s] the testing that was done and what happened in that testing[,]" and as such, there was no "valid reason for the [IME] to be videotaped."

---

[3]     Trevino also submitted an order from a different trial court finding Dr. Boake in contempt of court for not providing unaltered raw data, arguing that it "should not [be] presume[d] that Dr. Boake will follow court orders."

6

In response, Trevino argued that he "ha[d] shown a particularized need or special circumstances for allowing [the IME] to be videotaped." Trevino compared his evidence to that presented by the real parties in interest in *UV Logistics*, where this Court held relator was not entitled to mandamus relief stemming from the trial court's order directing that the IME of real parties be video recorded. 682 S.W.3d at 627. He compared himself to the real parties in *UV Logistics*, arguing that his case was "something similar" in that Dr. Keichian had diagnosed him with "traumatic brain jury" and his mother testified his "memory [wa]s really impaired." Trevino differentiated between being examined by Dr. Boake, for which he requested recording, and being examined by his treating doctor, which was not recorded, stating that his doctor "meant to help him get better," and was not hired "solely for the purpose of litigation."

The trial court orally granted Relators' motion to compel an IME, but it ordered that the IME be videotaped. The trial court later signed an order on March 6, 2025, granting Relators' motion to compel and ordering that Trevino's IME be audio and video recorded.

Relators seek mandamus relief arguing the trial court abused its discretion in ordering that the IME be video and audio recorded, and that they lack an adequate remedy by appeal.

## Standard of Review

Mandamus is an extraordinary remedy that is available only in limited circumstances. *See Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992) (orig. proceeding). To secure mandamus relief, a relator must establish that (1) the trial court committed a clear abuse of discretion or violated a duty imposed by law, and (2) there is no adequate remedy by appeal. *In re Prudential Ins. Co.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding). A trial court abuses its discretion when "it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to correctly analyze or apply the law." *In re Cerberus Capital Mgmt. L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding) (internal quotation marks and citations omitted); *see also In re Bailey-Newell*, 439 S.W.3d 428, 431 (Tex. App.—Houston [1st Dist.] 2014, orig. proceeding). "A trial court has no discretion in determining what the law is or applying the law to the facts." *Walker*, 827 S.W.2d at 840 (internal quotation marks omitted).

When resolving factual issues or matters committed to the trial court's discretion, this Court may not substitute its judgment for that of the trial court. *Id.* at 839–40; *see also In re Sanders*, 153 S.W.3d 54, 56 (Tex. 2004) (orig. proceeding). "In other words, under an abuse of discretion standard, this Court should defer to the trial court's factual determinations if they are supported by the evidence." *In re*

*Reedle*, No. 05-16-01483-CV, 2017 WL 944030, at *2 (Tex. App.—Dallas March 10, 2017, orig. proceeding) (mem. op) (citing *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding)). Less deference is afforded the trial court's determination of legal principles that control its ruling. *See Walker*, 827 S.W.2d at 840. A trial court has no discretion in determining what the law is or in applying the law to the facts of the case and thus, a clear failure by the trial court to analyze or apply the law constitutes an abuse of discretion. *See id.*

**Abuse of Discretion**

Texas Rule of Civil Procedure 204 governs the procedures for court-ordered physical and mental examinations. *See* TEX. R. CIV. P. 204.1. No later than thirty days before the end of the applicable discovery period, a party may move to compel another party to submit to an examination by a qualified physician. *See* TEX. R. CIV. P. 204.1(a)(1). A trial court may compel an examination only for good cause shown and when the party's mental or physical condition is in controversy or the party responding to the motion designated a psychologist as a testifying expert or disclosed a psychologist's records for possible use at trial. *See id*; *In re Sherwin-Williams Co.*, 668 S.W.3d 368, 370 (Tex. 2023); *see also In re Soc'y of Our Lady of Most Holy Trinity*, 622 S.W.3d 1, 11 Tex. App.—Corpus Christi–Edinburgh 2019, orig. proceeding). The "good cause" requirement balances one party's right to a fair trial with the other party's right to privacy. *In re H.E.B. Grocery Co.*, 492 S.W.3d 300,

9

303 (Tex. 2016). To establish good cause, a "movant must show that (1) the examination is relevant to the issue in controversy and is likely to lead to relevant evidence, (2) there is a 'reasonable nexus between the examination and the condition in controversy,' and (3) the desired information 'cannot be obtained by less intrusive means.'" *In re Sherwin-Williams Co.*, 668 S.W.3d at 371 (quoting *In re H.E.B. Grocery Co.*, 492 S.W.3d at 303).

Whether to grant a Rule 204 motion for an examination is left to the trial court's discretion. *See In re Offshore Marine Contractors, Inc.*, 496 S.W.3d 796, 800 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding). Rule 204 requires the trial court to specify "the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made." TEX. R. CIV. P. 204.1(d). While trial courts retain discretion to place reasonable limits on an examination, courts should be mindful to "[a]llow[] both parties' experts to operate on a level playing field . . . ." *See In re Offshore Marine Contractors*, 496 S.W.3d at 803. The limitations and conditions imposed must be reasonable. *Id.*

## A. Recording of Rule 204 Examination

In *Soc'y of Our Lady of Most Holy Trinity* ("*Society*"), the court analyzed whether the trial court's requirement that an IME be video recorded imposed a reasonable limitation. 622 S.W.3d at 12. The court surveyed federal cases addressing this question, noting the absence of Texas law on the issue. *Id.* at 12–13.

10

Explaining that a majority of federal courts reject "the notion that a third party should be allowed, even indirectly through a recording device to observe [an] examination," the court concluded that absent a showing of particularized need, video recording of an IME should not be permitted under Rule 204. *Id.* at 13, 17 (explaining that recording introduces "a human or mechanical presence—whether a lawyer, a stenographer, a tape recorder or other instrumentality—[that] changes the nature of the proceeding"). The court concluded that a party requesting recording of an IME has "the burden to show a factual basis establishing special circumstances which constitute good cause for the accommodation." *Id.* at 18, 20 (granting mandamus relief because real parties did not establish good cause for recording of examination).[4] The court noted that requiring the party seeking the recording to establish special circumstances or a particularized need is consistent with the Texas Supreme Court's emphasis on the importance of giving the moving party's expert "the 'same opportunity' as the opposing party's expert 'to fully develop and present [his or her] opinion, ensuring a fair trial.'" *Id*. at 17 (quoting *In re H.E.B. Grocery Co.*, 492 S.W.3d at 304–05).

---

[4]    In addressing the recording of an IME, the court in *Society* discussed the similarities between Federal Rule of Civil Procedure 35 and Texas Rule of Civil Procedure 204.1. 622 S.W.3d at 12; *compare* TEX. R. CIV. P. 204.1(a) *with* FED. R. CIV. P. 35; *see also Coates v. Whittington*, 758 S.W.2d 749, 751 (Tex. 1988) (orig. proceeding) (explaining that former Rule 167a, predecessor to Rule 204.1, was derived from Federal Rule of Civil Procedure 35 and federal courts' construction of Rule 35 is thus helpful to analysis of Texas' examination rule).

We reached a similar conclusion in *UV Logistics*, holding that a party requesting that an IME be video recorded must "provide evidence, including specific facts of special circumstances or a particularized need" to establish good cause for the recording. 682 S.W.3d at 623 (holding real parties provided evidence establishing good cause for recording of their examination). Good cause is determined on a "case-by-case basis according to evidence showing a particularized need, rather than by a categorical determination based on the underlying tort or cause of action or the nature of the injury alleged." *In re Soc'y of Our Lady of Most Holy Trinity*, 622 S.W.3d at 18. Under this standard, "generalized concerns about accuracy, reliability, and methodology for the examination do not constitute good cause for recording," nor does

> the inherently adversarial nature of the examination, the fact that the examining physician was selected or paid for by opposing counsel, the theoretical potential for misconduct during the examination, the desire to obtain an accurate, dispute-free version of what was said, or the fear that the examination would become a de facto deposition.

*Id.* at 15.

A trial court should not permit recording of a mental or physical IME unless the party seeking to record the IME proves "special circumstances . . . supported by specific facts[.]" *See id*. at 17; *see also In re UV Logistics*, 682 S.W.3d at 623–24 (discussing scenarios in federal cases in which special circumstances have been established). Merely stating that a party has a traumatic brain injury is not sufficient

12

to establish special circumstances or a particularized need for recording. *See id.* at 624 (proof that real party had traumatic brain injury was not proof of special circumstances sufficient to support recording of independent neuropsychological examination); *In re Soc'y of Our Lady of Most Holy Trinity*, 622 S.W.3d at 18 (holding courts determine good cause on case-by-case basis showing particularized need not based on "the nature of the injury alleged").

The presence of a recording device "interjects an adversarial, partisan atmosphere into what should be otherwise a wholly objective inquiry" and thus, "subverts the purpose of the rule allowing examinations, which is to put the [parties] on an equal footing regarding the evaluation of [one's] medical or psychological status." *Id.* at 13. Based on this purpose, if a party has been examined by his physicians without recording, the other party generally should have the same opportunity. *See id.*; *see also In re Redbird Trails Apartments*, No. 05-20-00284-CV, 2020 WL 3445811, at *4 (Tex. App.—Dallas 2020, orig. proceeding) (mem. op.) (holding that "in the absence of proof of special circumstances or a particularized need for videotaping . . . the opposing party's examination, one party should not be required to videotape the examination when the other party did not").

## B. Evidence of Good Cause

Relators argue that the trial court abused its discretion in imposing limitations on Dr. Boake's neuropsychological examination of Trevino because he did not

establish the required "special circumstances or a particularized need supported by evidence amounting to good cause" to warrant recording of his examination. Relators assert that as a result, the trial court's ruling runs afoul of *UV Logistics* and *Society*, as it "places unwarranted and unworkable restrictions" on the examination, "depriv[ing] Relators of . . . their ability to present their defenses to Trevino's damages claims." Relators note that because Trevino's doctors, Dr. Jasso and Dr. Keichian, examined him in person without any recording devices, Dr. Boake should be afforded the same opportunity. They argue the trial court's unilateral restriction on Dr. Boake is "arbitrary and unreasonable under Texas law" because it places Relators at a "severe disadvantage in the 'battle of the experts.'"

A party requesting recording has "the burden to show a factual basis establishing special circumstances which constitute good cause for the accommodation." *In re Soc'y of Our Lady of Most Holy Trinity*, 622 S.W.3d at 14 (citation omitted). As we previously noted, requiring a showing of special circumstances or a particularized need is consistent with Texas precedent emphasizing the importance of giving opposing parties' experts the same opportunity to fully develop and present their opinion, ensuring a fair trial. *See id.* at 17 (citing *In re H.E.B. Grocery Co.*, 492 S.W.3d at 304–05). And good cause is determined on a case-by-case basis depending on evidence of the particularized need, and not on the nature of the injury alleged. *See id.* at 18.

Trevino offers two arguments in support of the trial court's decision.  He first argues that for a variety of reasons, the holding in *Society* is questionable and we should decline to follow it.  He next argues that even if the good cause standard applies, he has presented evidence establishing a particularized need for the recording of his examination.

On his first point, Trevino argues that recording of an examination "poses no disruption to the psychological testing process when modern equipment is used" and that Relators have not demonstrated any "specific distraction, test-performance factor, or other examination impact to video recording."  Trevino further argues that the recording "does not prevent Relators from developing the testimony they need." Trevino speculates that there may be potential errors such as deviation from scoring and administration that occur during the IME, requiring that it be recorded.

Trevino also challenges *Society's* holding that special circumstances must be established to obtain an IME calling the decision "outlandish" and inviting us to reject its reasoning.  As to equal footing, Trevino responds that unlike Dr. Boake's proposed IME, which Trevino requests be audio and video recorded, his prior (unrecorded) examinations were conducted by non-retained treating physicians like Dr. Keichian. Trevino contends that *Society*'s ruling that it is only fair that opposing parties examine a plaintiff in the same manner is "not sound" and this Court should reject it because unlike a court-ordered IME by a hired expert, an examination by a

15

plaintiff's own doctor is "typically voluntary, non-adversarial, and unlikely to produce differing accounts of what occurred during the examination." Trevino last argues that the court in *Society* erroneously held that "a third-party observer and a recording device inject the same level of disruption to an [IME]."

We reject Trevino's arguments. As we held in *UV Logistics*, "we find *Society* to be well-reasoned and we reject [Trevino's] contention that it is 'unsound.'" *In re UV Logistics*, 682 S.W.3d at 620 (concluding that "the *Society* case is well-reasoned and we will follow it[.]") In line with *Society's* holding and in accord with our decision in *UV Logistics*, we conclude that the recording of an IME is not permitted unless the movant establishes special circumstances or a particularized need for the recording.

Trevino next argues that "Relators fail[ed] to present any legitimate or credible reason why the exam 'cannot' proceed in the manner specified," that "the recording requirement imposes no impediment [on] Dr. Boake's evaluation of [him], and Relators can point to no evidence of the contrary." The burden, however, rests on Trevino to satisfy the good cause standard.

Moreover, Relators produced evidence that recording Dr. Boake's neuropsychological examination would impact his evaluation of Trevino. Dr. Boake stated in his affidavit that "there is a conflict between the proposed recording of [his] examination and [his] obligation to comply with guidelines of neuropsychology

16

organizations." He explained that the "recording of test administration violates ethical standards that require psychologists to strive to obtain test data" that is "valid and that represent[s] the examinee's best possible performance." And he further explained that recording contravenes a recent guideline stating that "recording of the administration of neuropsychological tests is not permitted" because "[t]hird party observation, whether in person, recorded or electronic, remains a potential threat to the validity and reliability of evaluation results, and violates test security guidelines, ethical principles and standards of conduct in the field." As a result, should he be ordered to record his examination of Trevino, Dr. Boake stated he would have "to restrict [his] examination" to "mostly checklists and questionnaires" and he would have to omit "most routine neuropsychological tests." Given this evidence, which was unrefuted, we reject Trevino's argument that "the recording requirement imposes no impediment [on] Dr. Boake's evaluation of [him]."

On his second point, Trevino argues that he established good cause and specialized circumstances or particularized need for the audio and video recording of his IME. The only explanation Trevino proffers for requiring recording is that he would not be able "to communicate with counsel regarding the content and procedure for the examination" because he "suffers from significant cognitive deficits and memory issues" and his "unique medical condition[] [is] apt to render him unable to notice or accurately relay to his counsel any impropriety with the

17

[IME.]" Trevino, however, did not put forth a "particularized need" or identify with specificity the "specialized circumstances" that make his medical condition unique or would impede his ability to discuss the IME with his attorney. *See In re Soc'y of Our Lady of Most Holy Trinity*, 622 S.W.3d at 17.

In arguing in favor of audio and video recording, Trevino relies on (a) Dr. Keichian's testimony that he sustained a "traumatic brain injury" in the car accident, resulting in "memory problems, difficulty concentrating, headaches, and decreased executive functions"; (b) Dr. Jasso's diagnosis of "serious thought dysfunction" consisting of "disordered thinking, delusions, hallucinations and unrealistic thinking"; and (c) his mother's testimony that he has "constant memory issues" that are "consistent and unbearable," and are "not like those of a normal person, where occasionally someone will forget something."

Trevino also relies on *UV Logistics* in arguing that he suffers from poor memory and decreased attention due to his diagnosed traumatic brain injury and that his poor memory and focus issues will prevent him from communicating with his attorney about Dr. Boake's examination.[5]  But merely stating that an individual has

---

[5]    In arguing that mandamus relief should be denied, Trevino also cites *In re Genesis Marine, LLC*, No. 01-22-00028-CV, 2022 WL 2919935, at *1 (Tex. App.—Houston [1st Dist.] July 26, 2022, orig. proceeding) (mem. op.) (denying mandamus relief where trial court permitted audio recording of IME) and *In re Johnston*, No. 05-25-00099-CV, 2025 WL 1128799, at *1 (Tex. App.—Dallas Apr. 16, 2025, orig. proceeding) (mem. op.)  (holding that relators failed to demonstrate clear abuse of

18

a traumatic brain injury is not sufficient to establish special circumstances or a particularized need for recording. *See In re UV Logistics*, 682 S.W.3d at 624 (holding that proof that real party had traumatic brain injury was not proof of special circumstances sufficient to support recording of independent neuropsychological examination); *see also In re Soc'y of Our Lady of Most Holy Trinity*, 622 S.W.3d at 18 (courts determine good cause for allowing videotaping of examinations on a case-by-case basis showing particularized need not based on "the nature of the injury alleged").

In *UV Logistics*, real parties presented a physician's report setting out test results establishing significant shortcomings that could affect their ability to discuss their examination with counsel, including "'significant neuropsychological impairments' with deficits . . . mak[ing] it difficult for [one real party] to recall specifics of information heard when the information is unrelated." 682 S.W.3d at 626. Other real parties' medical reports showed forgetfulness, deficits in complex attention and auditory information processing speed, cognitive function, language, verbal fluency, visual recognition memory, and short-term memory problems, that could affect the recall of specific information if unrelated. *Id.* at 626–27.

---

discretion in challenging ordered recording of IME). Because these cases do not explain why relief was denied, they lend no support to Trevino's argument.

Trevino did not present similar evidence of "special circumstances" sufficient to support the requirement of video or audio recording. Trevino relied on deposition testimony of Dr. Keichian and his mother, however neither presented any facts establishing Trevino's inability to communicate with his attorney following his IME. Although Dr. Keichian testified as to a variety of diagnoses, there was no connection established between these diagnoses and Trevino's inability to communicate with his attorney after the IME. Aside from noting Trevino's self-reported general decrease in memory, Dr. Keichian did not offer any evidence or testing results that reflected an impairment that could prevent Trevino from remembering what occurred during his IME and communicating such to his attorney afterwards. In fact, Dr. Keichian recognized the significance of Trevino's ability to recall the events of the accident almost three years after its occurrence.

Dr. Keichian met with Trevino several times between July 2022 and May 2024. When he first saw Trevino in July 2022, Trevino complained of headaches and "decreased memory and attention span," which resulted in a diagnosis of "severe traumatic brain injury." Dr. Keichian testified that in September 2022, Trevino complained of similar symptoms including "decreased attention span, decreased immediate memory, disorientation in time intermittently, [and] at times difficulty finding words." Dr. Keichian further testified that in July 2023, he found Trevino to be "fully oriented with [a] decrease in memory, attention span, and high executive

functions." In August 2023, Dr. Keichian noted that Trevino was being evaluated after a "severe traumatic brain injury" but also noted that Trevino had "no significant cognitive deficits . . . ."

Dr. Keichian then testified that in October 2023, Trevino was "enthusiastic . . . about dogs that he's raising[,] caring for and selling to . . . good customers," and that "this source of companionship and positive feelings" "will help [Trevino] with symptoms and with his improvements." He noted that Trevino "showed appropriate behavior and enthusiasm for his business, and no cognitive impairments." Dr. Keichian last saw Trevino in May 2024, on which date Trevino's main complaints included dizziness, vertigo, and vomiting. Trevino also complained of headaches, triggered by reading, but was responsive to Tylenol. Based on these self-reported symptoms, Dr. Keichian assessed Trevino with "T[raumatic] B[rain] I[njury], post-traumatic headaches, vestibular dysfunction, and depression."[6] Notable here is Dr. Keichian acknowledgment of Trevino still "ha[ving] a detailed recall of everything that happened in the moments after the accident" despite the passage of time. Equally as notable is Dr. Keichian's finding of "[n]o cognitive impairment" during his last evaluation of Trevino in May 2024.

---

[6] Dr. Keichian testified that vestibular dysfunction (dizziness and vertigo) usually occurs right after injury, and it was not clear to him why in Trevino's case it took so long after his accident to surface.

Relators also submitted a medical report from Trevino's neuropsychologist, Dr. Jasso, who examined Trevino in November 2022. He conducted three tests, totaling twenty-four hours in duration, without video or audio recording. Although Dr. Jasso's report of his evaluation of Trevino reflected impairment of memory, these results do not reveal serious memory deficits that could prevent Trevino from communicating with counsel about his IME. Despite noting Trevino's troubled feelings and complains of difficulty in "[r]emembering important things that must be done," Dr. Jasso found Trevino's "overall mental status [to be] normal." Indeed, Dr. Jasso's report indicated that Trevino arrived on time to his examination, appeared well-groomed, was cooperative, oriented, and made eye contact during his evaluation. He stated that Trevino was "oriented to the day, month, and year" and to "person and place." He further stated that Trevino was "not tangential or circumstantial, as he provided detailed information regarding his condition as well as relevant autobiographical information." He "answered questions appropriately and provided evidence of good conation" and he "displayed no evidence of a serious mental illness, such as los[s] [of] contact with reality, thought disorder, hallucinations or delusions." Although Dr. Jasso indicated that Trevino had a "level of significant functional impairment[,]" which "measures the functional memory activities, understanding instructions, and keeping appointments[,]" Dr. Jasso noted that it was "self-perceived." Further, Dr. Jasso's mention of Trevino's responses

22

representing those individuals with "memory complaints, difficulties with concentration, intellectual limitations and confusion," was only to provided context for clinical use.

Indeed, Dr. Jasso's conclusion of Trevino's personality was that his "performance . . . appear[ed] to be too ambiguous for valid interpretation." In evaluating Trevino's intelligence, Dr. Jasso found that he tested "[a]bove [a]verage]" in his "range of fluid reasoning and working memory/attention abilities." Notably, Dr. Jasso did not mention memory or language deficits that could be interpreted as an inability of Trevino to communicate with his attorney about his examination of him or a future IME.

While Trevino's mother testified during her deposition that Trevino's "focus is . . . not good" and that he forgets things like taking out the trash after leaving the house or places where he would leave his personal belongings, such anecdotal testimony is not the type of evidence courts have required to establish a specialized need.

Thus, although there is some evidence of Trevino's diagnosis and reported symptoms, there was no connection established between these diagnoses and an inability to communicate with his attorney after an IME. There is no expert report or physician diagnosis of a specific cognitive impairment or deficit that would impair his ability to discuss his IME with his counsel.

We therefore conclude the trial court abused its discretion in ordering that the IME of Trevino be audio and video recorded.

## Adequate Remedy by Appeal

The adequacy of the appellate remedy is determined by balancing the benefits and detriments of mandamus review. *See Prudential*, 148 S.W.3d at 135–36. "Mandamus review of incidental, interlocutory rulings by the trial courts unduly interferes with trial court proceedings, distracts appellate court attention to issues that are unimportant both to the ultimate disposition of the case at hand and to the uniform development of the law, and adds unproductively to the expense and delay of civil litigation." *Id.* at 136. But where significant rulings in exceptional cases are involved, mandamus review "may be essential to preserve important substantive and procedural rights from impairment or loss, allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments, and spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings." *Id.*

"In the discovery context, an appellate remedy is not adequate if: '(1) the appellate court would not be able to cure the trial court's error on appeal; (2) the party's ability to present a viable claim or defense is vitiated or severely compromised; or (3) missing discovery cannot be made a part of the appellate record.'" *In re Offshore Marine Contractors*, 496 S.W.3d at 804 (quoting *In re Ford*

*Motor Co.*, 988 S.W.2d 714, 721 (Tex. 1998) (orig. proceeding)). A remedy by appeal is inadequate when a relator does not have the opportunity for its expert to "develop and present his opinion, ensuring a fair trial." *In re H.E.B. Grocery Co.*, 492 S.W.3d at 300.

Relators' concern that the viability of their defense will be detrimentally affected by the audio and video recording of the IME, because such recording will interfere with Dr. Boake's testing and ability to conduct a meaningful and complete neuropsychological evaluation, weighs in favor of mandamus review and the conclusion that a remedy by appeal is inadequate.

## Conclusion

We conditionally grant Relators' Petition for Writ of Mandamus and direct the trial court to vacate the portion of its March 6, 2025 order requiring that Trevino's IME be videotaped and audio recorded. The writ will issue only if the trial court fails to do so.

We lift the stay issued on April 25, 2025, and dismiss any pending motions as moot.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.

25